**STATE of Missouri, Respondent,**

v.

**Thomas James SIMS, Appellant.**

**No. WD 51535.**

Missouri Court of Appeals,
Western District.

Aug. 5, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 30, 1997.

Kent Denzel, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jacqueline K. Hamra, Asst. Atty. Gen., Jefferson City, for respondent.

Before LAURA DENVIR STITH, P.J., and BRECKENRIDGE and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Appellant Thomas J. Sims appeals his convictions for second degree robbery and armed criminal action. Mr. Sims claims that the trial court erred in failing to exclude two eyewitnesses' in-court identifications of him because their reliability was tainted by an impermissibly suggestive pre-trial line-up. Mr. Sims also argues that the trial court committed plain error in admitting the testimony of Mary Kathleen Felton in which she stated that Mr. Sims had previously used drugs and pawned some of her possessions. Finally, Mr. Sims asserts that the motion court erred in denying his Rule 29.15 motion for post-conviction relief because his trial counsel was ineffective in failing to object to the introduction of testimony concerning Mr. Sims' prior drug use and in failing to preserve an objection to the introduction of evidence concerning Mr. Sims' theft from his girlfriend. Finding no merit to his contentions on the facts of this case, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 23, 1994, Deana Conroy was working as a clerk at the Amoco gas station and convenience store at 4125 King Hill in St. Joseph. At approximately 7:30 p.m. that night, Ms. Conroy was alone in the store with her friend, Dusty Murphy. While they were talking, a man came into the store, got a can of pop from the cooler, and brought it to the register. As Ms. Conroy was ringing up the purchase, she realized that she had overcharged the man and corrected her mistake. When the sale was completed, the man left.

Less than a minute after leaving the store, the man returned with a four-way tire iron. The man pushed Ms. Murphy back, held up the tire iron, approached Ms. Conroy, and told her to give him money or he would hurt her. Ms. Conroy opened the cash register and held out the drawer, and the man grabbed a stack of twenty dollar bills. The man then ran out of the store. Ms. Conroy activated the alarm and threw Ms. Murphy the keys to lock the door.

After approximately ten minutes, the police arrived. Officer Martin questioned Ms. Conroy and Officer Harry Pena questioned Ms. Murphy. Both officers took written statements from the witnesses, and at no time were Ms. Conroy or Ms. Murphy questioned together. Ms. Conroy described the robber as a black male in his early thirties with collar-length braids, about 5'9", weighing about 140 pounds, wearing a white bandanna, a black hat turned backwards, no shirt, and black shorts. Ms. Murphy gave Officer Pena a very similar description of the robber, identifying him as a black male in his early thirties, with braided hair "with little like rubber bands on the tips", about 5'10", weighing approximately 140 pounds, wearing a white bandanna, a black cap on backwards, loose black shorts, and no shirt. Ms. Murphy also stated that the robber possibly had a mustache. The next day, at the police

station, Ms. Conroy identified a photograph of a man other than the defendant, but the latter was in jail and could not have committed the robberies.

Five days after the first robbery, on August 28, 1994, Valerie Pfleiderer was working at the Shop & Hop at 3625 King Hill. At about 10:10 that evening, while Ms. Pfleiderer was alone in the store, a man came in and asked to use the bathroom. After using the bathroom, the man left the store and moved his car, but he came back inside a few minutes later. Ms. Pfleiderer then heard the cigarette case beep, so she went over and got one carton of Marlboro cigarettes out of the case for the man. The man then opened the door the rest of the way and grabbed four more cartons. When they both started walking back to the front of the store, the man began to leave without paying. When Ms. Pfleiderer tried to stop him, he pushed her several times into the door and outside. Ms. Pfleiderer grabbed the man's shirt and the pair struggled, but the man eventually got away. Ms. Pfleiderer went back inside and called the police.

Again, Officer Pena responded to the scene of the robbery, talked to Ms. Pfleiderer, and took a written statement. Ms. Pfleiderer gave Officer Pena a description of the robber, describing him as a black male in his late twenties or early thirties, with a height of 5'9" to 6'1", weighing between 140 and 150 pounds, with short hair in "little French braids with little rubber bands on the tips", and wearing a white "do-rag" and a blue ball cap. Officer Pena noticed the similarity between this description and the description given by Ms. Murphy five days earlier.

On the evening of August 31, 1994 Mary Katherine Felton called the police station and told Officer Archie Auxier that she knew who had robbed the Amoco station on King Hill. Officer Auxier asked her if she would give a statement to a detective, and Ms. Felton later came to the station and spoke with Officer Gilpin. Officer Gilpin wrote down Ms. Felton's statement, and she signed it. In this written statement, Ms. Felton stated that her live-in boyfriend, Thomas Sims, told her that he had committed the Amoco station robbery. Mr. Sims was arrested that same day while Ms. Felton was giving the statement. It is unclear whether her statement was the only basis for the arrest.

On September 1, 1994, the day after Mr. Sims was arrested, Ms. Conroy and Ms. Pfleiderer viewed a line-up composed of Mr. Sims and five other African–American men. All of the men participating in the line-up wore identical orange coveralls and had a light mustache, but Mr. Sims was the only man in the line-up with braids in his hair. Both Ms. Conroy and Ms. Pfleiderer picked Mr. Sims out of the line-up.

On September 20, 1994, Mr. Sims was charged by information with the class B felony of robbery in the second degree and the class A felony of armed criminal action for the August 23, 1994, Amoco robbery. Mr. Sims' attorney made a motion to suppress Ms. Conroy's identification of Mr. Sims at the September 1, 1994, line-up and to suppress any future in-court identification of Mr. Sims by Ms. Conroy, arguing that the line-up was unduly suggestive and that it would taint any future in-court identification.

The judge reviewed the manner in which the line-up had been conducted and granted a continuance so that he could hear the testimony of Ms. Conroy concerning her opportunity to see the robber and the strength of her identification of Mr. Sims. He then issued a ruling in which he found that the line-up was impermissibly suggestive, stating:

[W]here the identifying witness gives her description of the perpetrator and that description includes some unique physical feature, such as a mustache or french braids, to have only one person with this unique identifying feature in the line-up is overly suggestive of that individual.... The court finds that the pre-trial identification of the defendant at the line-up was impermissibly suggestive. The line-up was made impermissibly suggestive by having only one person with french braids in the line-up, where the identifying witness had described the perpetrator as having this unique feature to police immediately after the robbery.

The judge nevertheless denied Mr. Sims' motion to suppress any in-court identification of him, holding that Ms. Conroy had adequate

independent basis for such an in-court identification.

On January 6, 1995, Mr. Sims was charged by information with the class B felony of robbery in the second degree for the August 28, 1994, Shop & Hop robbery. Mr. Sims' attorney also made a motion to suppress Ms. Pfleiderer's line-up identification of him in that case, and to exclude any future in-court identification on the basis that it would be impermissibly tainted by the line-up. On January 24, 1994, the court held a hearing on that motion. At the hearing's conclusion, the judge again ruled that the line-up itself was impermissibly suggestive but that Mr. Sims' motion to suppress any in-court identification would be denied because Ms. Pfleiderer possessed sufficient independent basis for a reliable in-court identification.

On February 10, 1995, the trial court granted the State's motion to consolidate the two cases, and they were tried jointly. At trial, Mr. Sims chose to introduce evidence of the line-up identifications. He apparently did so as a matter of trial strategy, so that the jury would know how suggestive the line-up had been, thus giving him the opportunity to later argue that the in-court identifications which he anticipated Ms. Conroy and Ms. Pfleiderer would make were tainted by the suggestive line-up (although both Ms. Conroy and Ms. Pfleiderer testified that they did not remember Mr. Sims having braids at the line-up). As anticipated, both later also identified Mr. Sims at trial. Defense counsel properly objected to Ms. Pfleiderer's in-court identification, but he failed to make a timely objection to that of Ms. Conroy. The latter thus came in without objection. In addition, Ms. Murphy, who was present in the store during the Amoco robbery and had not been present at the line-up, identified Mr. Sims as the robber at trial.

The jury found Mr. Sims guilty on all counts. The judge sentenced him to consecutive terms of twelve years for the Amoco robbery, five years for the armed criminal action conviction, and five years for the Shop & Hop robbery. Mr. Sims filed a Rule 29.15 motion for post-conviction relief, which was denied without an evidentiary hearing. This appeal followed.

## II. BOTH IN–COURT IDENTIFICATIONS OF MR. SIMS WERE ADMISSIBLE

In his first point on appeal, Mr. Sims argues that the trial court erred in denying his pretrial motion to suppress Ms. Conroy's and Ms. Pfleiderer's in-court identifications of him, claiming that the reliability of these identifications was irrevocably tainted by an impermissibly suggestive pretrial line-up.

■ Our review of a ruling on a motion to suppress is limited to a determination of whether there is sufficient evidence to sustain the trial court's ruling. *State v. Wise*, 879 S.W.2d 494, 503 (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). We consider the facts in the light most favorable to the trial court's ruling. *State v. Rodriguez*, 877 S.W.2d 106, 110 (Mo. banc 1994); *State v. Shaw*, 915 S.W.2d 775, 779 (Mo.App.1996). When determining whether evidence should have been suppressed, we review the record of the pretrial hearing on the motion to suppress and the record made at trial prior to the introduction of the evidence sought to be suppressed. *State v. Blackman*, 875 S.W.2d 122, 135 (Mo.App.1994).

■ In determining this issue, we note that the fact that a pre-trial line-up is unduly suggestive is not necessarily determinative of the inquiry whether an in-court identification is admissible. As the trial court noted, the determination of suggestiveness is just the first step of our inquiry. Next, we must consider what impact that suggestive procedure had on the reliability of the witness' identification. *State v. Vinson*, 800 S.W.2d 444, 446 (Mo. banc 1990); *State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. banc), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). "It is the reliability of an identification, not its suggestiveness, that supports admissibility, and a suggestive out-of-court identification procedure does not invalidate an in-court identification that is otherwise independently reliable." *State v. Tunstall*, 848 S.W.2d 530, 533 (Mo.App.1993).

■ Reliability is determined by examining the totality of the circumstances, includ-

ing: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior identification of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time between the crime and the confrontation. *State v. Simmons*, 875 S.W.2d 919, 922 (Mo.App.1994); *State v. Gibbs*, 875 S.W.2d 159, 162 (Mo.App.1994). Only if our review of these five factors indicates that the witness' testimony is not independently reliable will we find that the witness should not have been permitted to make an in-court identification.

■ Applying these five factors to Ms. Pfleiderer's testimony, we first consider her opportunity to view the criminal at the time of the crime. She testified that she saw the robber come into the store several minutes before the robbery and use the bathroom. Then, immediately preceding the robbery, she assisted him in getting some cigarettes from the case. She testified that the store was well-lit and that she and the robber were in close proximity during her struggle with him. She had ample time to observe the robber. This factor strongly favors admissibility. The second factor also favors admissibility, for Ms. Pfleiderer's testimony indicates she gave the robber a high degree of attention during the robbery. After the robbery she was able to give police a detailed description of the robber, including approximate age, height, weight, hair style, and dress. Ms. Pfleiderer even remembered the brand of cigarettes the robber tried to take.

The third factor—the accuracy of the witness' prior identification of the criminal—is not relevant, as the only time Ms. Pfleiderer ever identified Mr. Sims as the robber was when she picked him out of the police line-up on September 1, 1994. Those line-up results have been suppressed.

The fourth factor is the level of certainty demonstrated at the confrontation. At the pre-trial hearing on the motion to suppress, Ms. Pfleiderer indicated great certainty that Mr. Sims was the robber. She again expressed such certainty at trial, although this occurred after she had already made her in-court identification.

The final factor we consider is the length of time between the crime and the confrontation. This factor weighs somewhat against the reliability of the in-court identification in that Ms. Pfleiderer did not make her in-court identification of Mr. Sims until more than eight months after the robbery occurred. When balanced against the other factors, however, we cannot say that the trial court erred in finding that the impermissibly suggestive procedure did not unduly affect the reliability of the witnesses' in-court identification.

■ We are not required to apply these five factors to Ms. Conroy's testimony, because defense counsel failed to timely object to the admission of Ms. Conroy's in-court identification at trial. He failed to preserve this issue for appeal. We decline to review for plain error, for the record reveals no manifest injustice resulting from admission of this evidence. To the contrary, it shows that Ms. Conroy had even more opportunity to see the Amoco robber, that he had her complete attention and she gave a full and fairly accurate description of him after the robbery, and that she was certain of her identification. While she had made an inaccurate identification of a photograph of another man prior to the line-up, this is not sufficient on these facts to support a finding of plain error in admission of her in-court identification. In any event, her identification testimony was cumulative to that of Ms. Murphy.

## III. MS. FELTON'S TESTIMONY OF MR. SIMS' PRIOR DRUG USE AND STEALING

As his second point on appeal, Mr. Sims argues that the trial court erred in admitting the testimony of Mary Kathleen Felton in which she stated that Mr. Sims had previously used drugs and pawned some of her things. Mr. Sims acknowledges that he did not preserve either of these alleged errors for review, but he requests that we review these claims for plain error.

■ To be entitled to relief under the plain error rule, the defendant must show that the error affected his rights so substan-

tially that a miscarriage of justice or manifest injustice would occur if the error is not corrected. Rule 30.20; *State v. Silvey,* 894 S.W.2d 662, 671 (Mo. banc 1995); *State v. Gray,* 887 S.W.2d 369, 387 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). Manifest injustice depends on the facts and circumstances of the particular case and the defendant bears the burden of establishing manifest injustice amounting to plain error. *State v. Zindel,* 918 S.W.2d 239, 241 (Mo. banc 1996). The assertion of plain error places a much greater burden on a defendant than if the defendant had preserved the issue at trial. *State v. Bradshaw,* 845 S.W.2d 143, 144 (Mo.App. 1993). We do not find that this burden has been met here.

■ At trial, Ms. Felton testified that Mr. Sims had previously used drugs and had resumed using crack after July 1994. She also testified that they had financial trouble because they were both out of work. At various times, Mr. Sims had pawned Ms. Felton's VCR, camera, and lawn mower and had overdrawn checks on her account without her permission. On the day that Ms. Felton talked to the police, she and Mr. Sims went to the pawn shop and retrieved Ms. Felton's VCR, camera, and lawn mower. Mr. Sims then dropped Ms. Felton off at the store and left her there. When Ms. Felton was finally able to get another ride home, the items they had retrieved from the pawn shop were not there. Upon calling the pawn shop, Ms. Felton discovered that Mr. Sims had repawned the items. It was then that she contacted the police and told them that Mr. Sims had committed the Amoco station robbery.

■ Mr. Sims claims that all of this testimony was impermissible propensity evidence. As a general rule, evidence of prior uncharged crimes is inadmissible to show the defendant's propensity to commit crimes. *State v. Conley,* 873 S.W.2d 233, 236 (Mo. banc 1994). Evidence of uncharged conduct may, however, be admissible to show motive, intent, absence of mistake or accident, identity, or a common plan or scheme. *Id.* Another exception exists for the admission of evidence of uncharged crimes that are part of

the circumstances or the sequence of events surrounding the offense charged. *State v. Harris,* 870 S.W.2d 798, 810 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). The evidence must have some legitimate tendency to establish the defendant's guilt of the present charge, and its probative value must outweigh its prejudicial effect. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993).

■ Numerous cases have admitted evidence of prior drug use to explain the defendant's motive to steal to feed his drug habit. *See, e.g., State v. Hudson,* 822 S.W.2d 477 (Mo.App.1991) (holding that evidence of prior drug use was relevant to establish motive for robbery); *State v. Lewis,* 734 S.W.2d 515 (Mo.App.1987), *overruled on other grounds, State v. Carson,* 941 S.W.2d 518 (Mo. banc 1997) (holding evidence of cocaine habit admissible under motive exception to general exclusion of other crimes evidence where witness testified that the defendant had committed burglary to support that habit). Wide latitude is allowed in developing evidence of motive. *State v. Blackman,* 875 S.W.2d 122, 139 (Mo.App.1994).

As in the above cases, the evidence of Mr. Sims' prior drug use and of the fact that he was pawning his girlfriend's things to obtain money for drugs helped show that he had a motive to commit the crimes. While Mr. Sims claims that motive was not an issue in the trial, evidence of motive always has "great probative value" and "absence of motive has been a pivotal factor in determinations as to the sufficiency of the evidence." *State v. Mallett,* 732 S.W.2d 527, 535 (Mo. banc 1987), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987).

Ms. Felton's testimony regarding Mr. Sims' pawning of her things also explained her actions in initially calling police and telling them that he had admitted he committed the Amoco robbery, and then at trial denying that he had ever made such an admission. As the trial court stated in admitting the evidence:

Based on these circumstances outlined to me, the Court feels that's relevant to explain the conduct of this witness and to

explain how the statement was made by this witness that this defendant committed the robbery. So I think it's relevant circumstances.

Indeed, defense counsel used the pawn shop evidence to try to show that Ms. Felton had a motive to lie to the police. He nonetheless now argues that, even if relevant, that evidence was unduly prejudicial and thus should have been excluded. However, as the trial court stated in admitting the evidence:

> I understand there may be some prejudice to the defendant by the fact that it does show bad acts and may possibly show some other crime evidence, but it also is relevant with respect to explain the conduct of this witness and to show also the defendant's motive possibly in committing these robberies.
>
> . . . .
>
> And I have weighed those factors and the Court feels that the probative value outweighs the prejudice involved and that I think it's important that the jury understand all of the circumstances surrounding this witness' statements and the circumstances leading up to his being implicated as the robber in this case. And to leave that out, I think leaves relevant facts for the jury to consider in weighing the credibility of this witness.

This balancing of the probative value against prejudicial effect is in the sound discretion of the trial court. *Blackman,* 875 S.W.2d at 139. We do not find that admission of this testimony amounted to a miscarriage of justice or manifest injustice.

Mr. Sims also argues in his reply brief, in reliance on *State v. Bowman,* 741 S.W.2d 10 (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988), that his statement to Ms. Felton that he had committed the Amoco robbery is admissible only for impeachment, and not as substantive evidence, because at trial she denied making that statement. This argument was not made below or in Mr. Sims initial brief, and is not preserved for appeal. Moreover, at trial Ms. Felton did not deny making the statement that Mr. Sims had confessed. Rather, she admitted that she told police Mr. Sims had confessed to her, but claimed that she was lying and Mr. Sims did not in fact commit the robbery. Finally, as we recently discussed at length in *State v. Woodworth,* 941 S.W.2d 679 (Mo.App.1997), even if Ms. Felton had denied making the prior statement, it would still be admissible as substantive evidence because it is a prior inconsistent statement for which there was independent verification.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

As his final point on appeal, Mr. Sims asserts that the motion court erred in denying his Rule 29.15 motion for post-conviction relief because his trial counsel was ineffective in failing to object to the introduction of testimony concerning Mr. Sims' prior drug use and in failing to preserve his objection to introduction of evidence concerning Mr. Sims' theft from his girlfriend.

Our review of a dismissal of a 29.15 motion is limited to a determination of whether the trial court's findings and conclusions are clearly erroneous. Rule 29.15(k); *State v. Driver,* 912 S.W.2d 52, 54 (Mo. banc 1995). Findings and conclusions are clearly erroneous only if, after a review of the entire record, we are left with the definite and firm impression that a mistake has been made. *State v. Storey,* 901 S.W.2d 886, 893 (Mo. banc 1995).

To prove a claim of ineffective assistance of counsel, the defendant must show by a preponderance of the evidence that his attorney failed to exercise the customary skill and diligence that a reasonable competent attorney would have exhibited under similar circumstances and that he was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Storey,* 901 S.W.2d at 893. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

Here, Mr. Sims has failed to meet his burden to show that his trial counsel was ineffective. The errors he alleges made his counsel incompetent were not preserved. A

defendant can not "convert unpreserved error into viable error by arguing incompetence." *Jones v. State,* 784 S.W.2d 789, 793 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990). The decision of whether to object is a strategic decision left to the judgment of trial counsel. *State v. Suarez,* 867 S.W.2d 583, 587 (Mo. App.1993). Even assuming an objection would have been meritorious, "[t]he fact that a meritorious objection is not made does not demonstrate incompetence." *Jones,* 784 S.W.2d at 793.

In any event, Mr. Sims has failed to show prejudice from counsel's actions. There was overwhelming evidence of Mr. Sims' guilt: three eyewitnesses identified him, he matched the description of the robber, Ms. Pfleiderer identified a car like Mr. Sims', and he confessed to his girlfriend that he had committed one of the crimes. Mr. Sims has thus failed to show a reasonable probability that the outcome of the case would have been different if his attorney had objected to admission of the evidence at trial. For these reasons, the motion's court denial of Mr. Sims' postconviction motion was not clearly erroneous.

For all the foregoing reasons, we affirm Mr. Sims' convictions and affirm denial of his motion for post-conviction relief.

All concur.