

# In the Missouri Court of Appeals Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED100473 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | 1122-CR05948 |
| | ) | |
| MICHAEL J. FORD, | ) | Honorable Michael K. Mullen |
| | ) | |
| Appellant. | ) | FILED: February 10, 2015 |

## Introduction

Michael J. Ford (Ford) appeals from a sentence and judgment of conviction for first-degree murder and armed criminal action. He asserts there was insufficient evidence to support his conviction, and he challenges the admission of certain evidence. We affirm.

## Background

The State of Missouri (State) charged Ford as a prior and persistent offender along with Antoine Barton (Antoine) and Dejuan Blocker (Dejuan)[1] with first-degree murder and armed criminal action for the shooting death of Calvin Ross (Victim). The evidence at the 2013 jury trial showed the following, viewed in a light most favorable to the verdict.[2]

---

[1] Due to the similarity in Antoine Barton's and Dejuan Blocker's last names, we refer to them by their first names to avoid confusion. No disrespect is intended.

[2] State v. Gibbs, 306 S.W.3d 178, 181 (Mo. App. E.D. 2010).

Ford was arrested on an unrelated weapons charge. During his interview for that offense, he indicated he had information about a murder, later revealed to be the murder of Victim. He made a videotaped statement to the police, in which he asserted the following. Ford was driving around with Antoine on July 6, 2011, when Antoine pointed out Victim as someone who had shot at him a while ago and Antoine said he had to "take him out." Ford understood that Antoine intended to kill Victim, but Ford stated that in his experience, Antoine did not always carry through on his threats. Ford had purchased a .38 caliber revolver the day before and Antoine asked for it. Ford had some shells for the gun, and they went to an alley to test fire the gun. It was operational. Ford then reloaded the gun at his house before giving it to Antoine.

Meanwhile, Antoine had enlisted Dejuan to keep Victim in the neighborhood while Ford and Antoine drove Ford's brother and cousin to St. Louis County. While in the vehicle with Antoine, Ford overheard multiple telephone conversations between Antoine and Dejuan discussing Victim. Dejuan wanted to kill Victim, so as to "get his stripes" and prove himself, and Antoine was considering it. Ford counseled Antoine not to let Dejuan do it, saying that if Dejuan was caught, it would fall on Antoine. Moreover, Ford did not want Dejuan to "do it" with his gun.

Ford and Antoine arrived back in the neighborhood, and Antoine and Dejuan went into an alley with Victim while Ford waited by the car. Ford did not hear any gunshots, but when Antoine came back, he said "it's 4-7," from which Ford understood Antoine had "got on [Victim]" and "whacked"[3] him. Antoine showed Ford a .357 revolver that he had taken from

---

[3] On cross-examination, Ford argued he said "jacked" not "whacked," but from our review of the videotaped statement we believe he said "whacked."

Victim. A person named Tato, who Ford described as "OG,"[4] then arrived and took Antoine to dispose of Ford's .38 revolver.

The State played Ford's statement to the jury. Officer Charles Betts, a homicide detective with the St. Louis Metropolitan Police Department (police department), testified that he had interviewed Ford and that the evidence corroborated Ford's statement. He further testified that Victim was shot at approximately 10:45 p.m. on July 6, 2011. Likewise, Detective Joseph Lankford also testified that he had subpoenaed Antoine's telephone records, which showed multiple calls between Antoine and the house at which Dejuan and Victim had spent the day. Detective Lankford testified their theory was that Antoine shot Victim, while Dejuan was the set-up man, and Ford provided the weapon.

The State then called Emily Blackburn, a crime analyst for the police department, as a lay witness. The State argued it did not need to call her as an expert witness, because "all [she does] is take latitudes and longitudes from Sprint cell phone records and plot them on a map. … She can't say that the phone was at [a specific] location." Defense counsel stated she did not object to Blackburn being called as a lay witness. Blackburn testified she had received the data from Sprint subpoenaed by Detective Lankford. The data showed which cellular towers were used at what time for each call made by Antoine on the day of Victim's murder, and she entered the information into a mapping program. She testified that cellular telephones generally use the closest tower, but the connection can be affected by tall buildings, geography, and topography, among other things. The State offered the map of cell tower connections, to which defense counsel objected only subject to cross-examination and voir dire. From the map, Blackburn testified that Antoine's telephone connected to a tower close to the murder scene at 10:00 p.m.,

---

[4] The interviewing officer testified that OG meant "old gang." It could also mean "original gangster."

close to the airport at approximately 10:30 p.m., and again close to the murder scene at 10:45 p.m.

Further, Blackburn testified that she had also received Per Call Measurement Data (PCMD) from Sprint. PCMD was different from the cell tower data, because it measured the radio frequency distance between the telephone and nearby towers, and gave an estimate of the location of the telephone itself during the call. Accordingly, Blackburn testified that on the day Victim was killed, the PCMD indicated Antoine's cellular telephone was near the murder scene at 10:45 p.m. The trial court admitted without further objection the State's maps of the cell tower locations and the PCMD location estimates. Ford moved for judgment of acquittal at the close of the State's evidence, but the trial court denied the motion.

Ford testified in his own defense to the following. He did not know Victim before Antoine pointed him out the day of the murder. He did not know that Antoine planned to kill Victim; rather, he thought that Antoine would just beat up or rob Victim. He did not give Antoine the gun so that he could kill Victim; rather, Antoine had requested the gun on July 5, before Ford had heard of Victim. Antoine never said he was going to kill Victim or that he needed Ford's gun to kill Victim.

Ford further testified that he was carrying a gun for his protection because he had been shot when he was young. He was not planning to "shoot someone for no reason." On cross-examination, the State then asked Ford, "[d]idn't you tell the police that you get guns all the time?" Defense counsel objected and requested a mistrial, arguing the question raised the issue of uncharged crimes. The State responded that Ford opened the door to the issue by stating he only needed the gun for protection. The trial court overruled the objection, and Ford agreed he and his crew would break into vehicles around clubs that prohibited weapons to steal guns left in

4

the vehicles. If the owners confronted him while he was trying to break into the vehicles, then he would shoot at them.

Ford moved for judgment of acquittal, which the trial court denied. The jury found Ford guilty of first-degree murder and armed criminal action. The trial court sentenced Ford to life in prison without the possibility of parole. This appeal follows.

## Discussion

### Point One

In his first point on appeal, Ford argues the trial court erred in overruling his motions for judgment of acquittal and in entering judgment against him, because the State's evidence was insufficient to support a finding of guilt beyond a reasonable doubt for the charge of murder in the first degree, in that the State's evidence did not establish beyond a reasonable doubt that Ford independently deliberated upon the death of Victim. We disagree.

We review challenges to the sufficiency of the evidence supporting a criminal conviction by determining whether the State presented sufficient evidence at trial from which a reasonable juror might have found the defendant guilty of all the essential elements of the crime. State v. Gibbs, 306 S.W.3d 178, 181 (Mo. App. E.D. 2010). We accept as true all evidence supporting the jury's verdict, including all favorable inferences therefrom, and disregard all contrary evidence and negative inferences. Id. We do not act as a super juror but will defer to the trier of fact. State v. Nash, 339 S.W.3d 500, 559 (Mo. banc 2011).

The State is required to prove beyond a reasonable doubt each element of the offense charged. State v. Danikas, 11 S.W.3d 782, 788 (Mo. App. W.D. 1999). The State charged Ford with first degree murder, which occurs when a person "knowingly causes the death of another person after deliberation upon the matter." Mo. Stat. RSMo. 565.020.1 (2000). The element of

5

deliberation is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3). Deliberation is inferred from the circumstances surrounding the crime, and it is only necessary that the evidence show the defendant considered taking another's life. State v. Howery, 427 S.W.3d 236, 246 (Mo. App. E.D. 2014). Three circumstances can establish deliberation on the part of a defendant where a codefendant pulled the trigger: (1) where there is a statement or conduct by a codefendant in the presence of the defendant prior to the murder indicating a purpose to kill; (2) where the murder was committed by means of a deadly weapon and the defendant was aware the weapon was going to be used in the commission of the crime; and (3) the defendant participated in the homicide or criminal enterprise once it became apparent that a victim would be killed. State v. Gray, 887 S.W.2d 369, 376-77 (Mo. banc 1994).

The first two circumstances set forth in Gray exist here. First, in his statement to the police, Ford stated Antoine told him he was going to "take [Victim] out," by which Ford understood that Antoine intended to kill Victim. Further, Ford stated he overheard multiple telephone conversations between Antoine and Dejuan about Victim, in which Dejuan stated he wanted to kill Victim, but Ford counseled Antoine to take care of it himself. Second, Ford provided Antoine with a gun, he knew that Antoine intended to use the gun to kill Victim, and Antoine did in fact kill Victim with the gun Ford provided. Using the standard set forth in Gray, this evidence was sufficient to establish Ford's deliberation on the matter. See Gray, 887 S.W.2d at 367-77. Thus, the jury could have concluded from the evidence in total that Ford knowingly caused the death of Victim after deliberation on the matter. See Section 565.020; Gibbs, 306 S.W.3d at 181.

On appeal, Ford points to alternative evidence indicating that he believed Antoine and Dejuan would only rob or beat up Victim, and thus argues that the evidence does not support

deliberation. However, on review, we view the evidence in the light most favorable to the jury's verdict. The jury is tasked with parsing the credibility and relative weight of conflicting evidence, State v. Greer, 159 S.W.3d 451, 457 (Mo. App. E.D. 2005), and this Court will not substitute our judgment for that of the jury's, Nash, 339 S.W.3d at 559. Giving deference to the trier of fact, we find the jury could have found beyond a reasonable doubt that Ford participated in the murder of Victim after deliberation upon the matter.

Point denied.

## Point Two

In his second point on appeal, Ford argues the trial court erred in allowing the State to cross-examine him with prior bad acts and uncharged crimes, in that the State's questions were used to show his propensity for violence and gun possession, were more prejudicial than probative, and were outcome determinative. We disagree.

The trial court has broad discretion to admit or deny evidence at trial. State v. Forrest, 183 S.W.3d 218, 223 (Mo. banc 2006). We will reverse for an abuse of that discretion only if the error was so prejudicial that it deprived the defendant of a fair trial. Id. at 224. Evidence of prior bad acts is generally inadmissible unless such proof tends to directly establish the defendant's guilt of the charge for which he is currently on trial. State v. Vorhess, 248 S.W.3d 585, 587 (Mo. banc 2008). There are a number of exceptions to this general ban, such as where the evidence is offered to rebut the defendant's voluntary assertions from the stand, including assertions about his own good character. State v. Marshall, 302 S.W.3d 720, 727 (Mo. App. S.D. 2010). "It is well established that a defendant who chooses to take the stand and testify on his own behalf 'is subject to contradiction and impeachment the same as any other witness.'" Id. (citations omitted). Where a defendant refers to a subject, even in a general way, he opens

himself to cross-examination on that subject. Id. at 728-29 (no error in allowing prosecution to impeach defendant with evidence of prior bad acts when he testified on direct that he was trying to be "a model citizen").

Here, Ford testified in his own defense. On direct examination, he testified that he was carrying a gun for his protection because he had been shot when he was young, and that he was not planning to "shoot someone for no reason." Then, on cross-examination, the trial court allowed the State over objection to question Ford about other incidents in which he had stolen guns and shot at people. The evidence was not admitted to show a propensity to commit crimes, but to impeach Ford's earlier testimony. Ford injected the issue of his reason for carrying a gun into the case in a manner that portrayed himself as a victim, and the trial court correctly allowed the State to impeach him on this basis by showing him as an aggressor, not a victim.

Point denied.

## Point Three

In his third point on appeal, Ford argues the trial court erred by admitting maps and testimony regarding cellular telephone records, in that the State improperly used the information to "locate" Ford near the crime scene, because the ability of cell tower signals to locate cellular telephones is a subject for an expert witness and the State did not qualify Blackburn as an expert witness. We agree but do not find reversible error.

In order to preserve an evidentiary issue for appeal, a party must object upon the introduction of the evidence. Howery, 427 S.W.3d at 248. An allegation of error below may not be changed or broadened on appeal, but must be based on the objection made at the time of trial. Id. Here, Ford did not object to the State calling Blackburn as a lay witness; he made only a general preliminary objection to the admission of the maps, "subject to voir dire and cross

examination"; and he did not object to Blackburn's location testimony. Ford made no objections on the basis that the evidence was a subject for an expert witness. Accordingly, Ford did not preserve the issue for appellate review, thus allowing only for plain error review.

Under plain error review, we will reverse only if a plain error affecting substantial rights results in manifest injustice or a miscarriage of justice. Rule 30.20[5]; State v. Floyd, 347 S.W.3d 115, 123-24 (Mo. App. E.D. 2011). We review for plain error using a two-step analysis. First, we determine whether the record facially establishes substantial grounds to believe plain error occurred, which is error that is evident, obvious, and clear. If so, we then consider whether the error resulted in manifest injustice or a miscarriage of justice. Id. Plain error review requires that the alleged error have a decisive effect on the jury's determination. See State v. White, 247 S.W.3d 557, 563 (Mo. App. E.D. 2007).

Here, the State offered Blackburn as a lay witness, saying "all [she does] is take latitudes and longitudes from Sprint cell phone records and plot them on a map. ... She can't say that the phone was at [a specific] location." Blackburn then testified that she had received two types of information from Sprint: a list of the cell towers Antoine's telephone used for each call he made, and PCMD, which measures the radio frequency distance between the actual telephone and nearby cell towers. She entered that information into a computer program to generate maps. Regarding the cell tower data, she testified that cellular telephones generally use the closest tower and that Antoine's telephone connected to a tower close to the murder scene at 10:45 p.m., which was Victim's approximate time of death. Regarding the PCMD, she testified that the radio frequency distance data indicated that Antoine's telephone was physically located at the scene of the murder at 10:45 p.m.

---

[5] All rule references are to Mo. R. Crim. P. (2014).

The issue on appeal is whether it was improper for a lay witness to use the cell tower information and the PCMD information to testify to the location of Antoine's telephone. We find that it was. This Court recently held that it was error for a trial court to fail to require an expert witness to testify as to the locations of cell towers used by the defendant's phone in order to place him near the crime scene at the time of the crime. State v. Patton, 419 S.W.3d 125, 132 (Mo. App. E.D. 2013). In Patton, the State's lay witness had testified that she had received and mapped information from the defendant's cellular telephone provider. She testified the map showed the defendant's telephone connected to cell towers in the vicinity of the crime near the time of the shootings, and she stated a telephone will usually connect to the closest cell tower.

This Court characterized the lay witness' testimony—that the strongest signal generally comes from the closest site—as "misleadingly simple." Id. at 131. Rather, historical cell tower data can show only that a cellular telephone was used somewhere within a cell tower's geographic coverage area, but the coverage areas of cell towers frequently overlap and a "multitude of factors influence which site among them will have the strongest signal." Id. Therefore, this Count concluded, "knowing the location of the cell site to which a phone connects permits an expansive range of inferences as to where the phone actually is. We think that drawing such an inference without the aid of specialized experience or knowledge in the field of cellular communications comes too close to mere speculation." Id. at 131-32.

Following Patton, it was error here for the trial court to allow Blackburn to testify as a lay witness that Antoine's telephone connected to a cell tower close to the murder scene at the time of the murder and that cell phones will usually connect to the closest tower. Such evidence was clearly intended to demonstrate that Antoine, and thus Ford, was in one area rather than another. Using cell tower information to offer evidence of the location of a defendant's telephone

10

"require[s] analysis of the many variables that influence cell site signal strength," id. at 132, and thus also requires an expert witness to provide that analysis.

Likewise, it was also error for the trial court to allow Blackburn to testify as to the location of Antoine's telephone based on PCMD, or radio frequency distance information. In general, expert testimony is appropriate when the witness has knowledge or skill in an area about which the jury lacks common knowledge or experience. See State v. Love, 963 S.W.2d 236, 241 (Mo. App. W.D. 1997). Expert testimony is proper "if the subject is one with which lay jurors are not likely to be conversant." Patton, 419 S.W.3d at 131 (citations omitted). We are confident that calculating location from radio frequency distance information is a subject with which the average juror lacks common knowledge or experience. Blackburn testified that she merely plotted the information she received from Sprint onto a map, and from that she testified as to Antoine's location. Blackburn agreed she had no specialized experience or knowledge in the field of wireless communications, and she did not testify to how radio frequency distance calculations worked or to their accuracy. Without this explanatory testimony, the jury, for want of experience or knowledge, would be incapable of drawing a proper conclusion from the facts in evidence. See State v. Harris, 305 S.W.3d 482, 490 (Mo. App. E.D. 2010). Thus, we hold that the trial court erred in allowing Blackburn, a lay witness, to testify as to the location of Antoine's telephone in relation to the cell towers to which it connected.

Because the trial court committed an error that was evident, obvious, and clear, we now must determine whether that error resulted in manifest injustice or a miscarriage of justice. Floyd, 347 S.W.3d at 123-24. It did not. Where there is substantial corroborating evidence properly admitted at trial, the admission of improper evidence does not constitute plain error. See Howery, 427 S.W.3d at 249. Ford argues on appeal that the evidence regarding the location

11

of Antoine's cellular telephone was improperly used to place Ford in the vicinity of the murder scene; however, Ford himself testified at trial that he was in the vicinity of the murder when it occurred. He testified that he was waiting at the car while Antoine and Dejaun went into the alley with Victim. Ford's defense was that he did not know Antoine intended to kill Victim, and the location of Antoine's telephone was not relevant to disproving that theory; thus, the evidence did not have a decisive effect on the jury's determination. See White, 247 S.W.3d at 563. Considering the record as a whole, we do not find that Blackburn's testimony prejudiced Ford such that he suffered a manifest injustice or miscarriage of justice.

Point denied.

## Conclusion

The judgment of the trial court is affirmed.

Gary M. Gaertner, Jr., Judge

Kurt S. Odenwald, P. J., concurs.
Robert G. Dowd, Jr., J., concurs.

12