IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,414

STATE OF KANSAS,
*Appellee*,

v.

CORTEZ TYRELL TIMLEY,
*Appellant*.

SYLLABUS BY THE COURT

1.

Prosecutors are given wide latitude in crafting both opening statements and closing arguments, but the inferences prosecutors draw from the evidence must be reasonable.

2.

A prosecutor's allegedly erroneous statement must be evaluated in light of the context in which it was made.

3.

A district court must exercise discretion in determining whether evidence submitted by a witness, lay or expert, is supported by sufficient foundation.

4.

Under the facts of the case, sufficient foundation supported the admission of maps derived from previously admitted cellular phone data, along with accompanying testimony, without the need for an expert witness.

1

5.

Under the facts of the case, the district court's failure to sua sponte instruct the jury on the lesser included offense of intentional second-degree murder was not clearly erroneous.

6.

In a noncapital case, a district court's failure to sua sponte instruct on a lesser included offense does not violate a defendant's constitutional right to due process.

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed August 7, 2020. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Cortez Tyrell Timley appeals his conviction for first-degree premeditated murder in the killing of Jermel Robbins. Finding no reversible error, we affirm his conviction.

## FACTS

On the afternoon of June 13, 2014, law enforcement responded to a 911 call and found a man—later identified as Robbins—lying in the front yard of a house. Robbins had suffered gunshot wounds to his leg and his back, from which he soon died.

Several witnesses saw a blue or gray Dodge Magnum driving down the street at the time of the shooting; one witness also saw the Magnum drive down the street 5 to 10 minutes before the shooting but noted that the Magnum "came back around" before the shooting. According to this witness, the Magnum's driver was a "light skinned dude" with "short hair," but the shots came from the passenger window. This witness noted that the shooter's arms were tattooed, but he could not recall the shooter's skin color. Another witness saw the shooter fire from the Magnum's front passenger window; this witness identified the shooter as being black. And a third witness—who did not see the shooting itself but who heard the shots—reported a partial license plate number to law enforcement.

Based on the partial license plate number and the identification of the vehicle involved in the shooting as a gray Dodge Magnum, law enforcement matched the vehicle to one owned by Jazmine Christopher, a resident of Independence, Missouri. Law enforcement suspected the shooter was Timley, who was Christopher's boyfriend at the time.

Timley was apprehended in a white Chevy Malibu in Kansas City later that day, along with Eric Price and D'Ante Boykins. Price, who was "more white," long-haired, and relatively thin, was Timley's best friend. Boykins was Timley's cousin, and had grown up with Price and Timley. Officers recovered a broken Kyocera flip phone from the seat in the Malibu where Timley had been sitting. The flip phone's "cables were completely severed."

According to Christopher, Timley left her residence at about 12:30 in the afternoon. When she called him around 1:09 p.m. to ask a favor, Timley told her he was "too far away from home." Christopher told officers that Timley had had the Magnum "all day." She also speculated that Timley had gone to Topeka to drop off his son with

Timley's mother, who lived near Lake Shawnee in Topeka, "[o]ff of 45th." According to Detective Justin Broxterman, Timley gave an address on Southeast 43rd Terrace in Topeka where "he spends a lot of time."

Broxterman acquired records relating to the location and call data of Timley's phone—the broken flip phone recovered from the Malibu—from Sprint. Various cellphone records were admitted into evidence without objection, alongside the testimony of Sprint records custodian Ricardo Leal. Leal could not guarantee "with all certainty" that the location information provided in cellphone records was accurate.

Over the objection of Timley's counsel, Broxterman testified about the relative position of Timley's phone throughout the day of the shooting. Broxterman had input the Sprint information—that included "which cell tower it was and which side of that cell tower it was accessing"—into a program to plot out the trajectory of Timley's phone. He then generated maps depicting the cell tower accessed by Timley's phone at different times of the day, although he noted that the maps did not depict the distance of the phone from each tower.

According to Broxterman, Timley's phone remained in the area of the Independence residence until about 12:40 p.m. on the day of the shooting. The phone then headed west along the same general trajectory of I-70 and, by 2:09 p.m., it began to access a cell tower in Topeka. At 2:37 p.m., which was shortly before the shooting, Timley's phone accessed a cell tower in Topeka. According to Per Call Measurement Data (PCMD) provided by Sprint, Timley's phone was estimated to be approximately 2.63 miles away from that tower. As the crow flies, the scene of the shooting was exactly 2.63 miles from the same tower. Later, Timley's phone eventually headed east, this time traveling north of I-70; by 5:03 p.m., it was back in the area of Kansas City.

4

Broxterman admitted that the PCMD provided by Sprint was merely an estimate used by engineers, rather than a definitive statement of fact. Broxterman read Sprint's PCMD disclaimer aloud for the jury—which emphasized the potential inaccuracy of the PCMD, depending on several variables—and that "Sprint will not guarantee the accuracy of the location information." When pressed about the accuracy of the PCMD information Broxterman said:

> "Sprint told me their numbers can be inaccurate. They can't validate them or verify them. I can tell you, though, mapping the distance from the tower to the house, which is what I illustrated, I know he hit this side of this tower, and I know the house is 2.63 miles from the tower. I'm just making a point that Sprint's records show, whether it can be verified or not, the handset was estimated to be 2.63 miles."

Broxterman further emphasized that "I'm not saying that Sprint tells me the handset's there. So if you overlay your thing, he could be, like you said, anywhere in here. I'm just telling you, the records say the estimate is 2.63 miles, and in fact, the house is 2.63 miles."

Dreux Doty testified as an expert witness for Timley with respect to the cellphone location data, and his report was also admitted at trial. Doty emphasized that there was no exact GPS data for the flip phone once it left the Kansas City metro area and that any estimates of distance in Topeka were just that—estimates. However, Doty agreed that Sprint's figure of 2.63 miles was "a rational estimate."

The jury was instructed on the charged crime of first-degree murder. No lesser included offense instructions were given or requested, and Timley's counsel raised no objection to the jury instructions. Timley was ultimately convicted of one count of first-degree murder. He then appealed his conviction to this court.

ANALYSIS

Timley raises five issues for our consideration. We agree that he has identified at least one error but rule that it was not reversible.

*Prosecutorial error*

Timley claims that the prosecutor committed prosecutorial error by making statements, during both opening and closing arguments, concerning the location of Timley's phone at the time of the shooting. Specifically, Timley claims that the prosecutor mischaracterized the Sprint data's depiction of the location of Timley's phone as an unimpeachable fact, rather than an unreliable estimate. In order to properly evaluate those claims, the prosecutor's statements must be considered in some detail.

In the State's opening statement, the prosecutor told the jury—without objection—that the evidence would show that:

> "[W]here the defendant's phone has been, is not only coming to Topeka that same afternoon, but exactly 2.46 miles [*sic*] from the shooting location. And we know that because his phone pings off a tower. That tower is 2.46 miles [*sic*] from [the address of the shooting]. *So the defendant's phone is exactly at the location of the shooting at the time of the shooting.*" (Emphasis added.)

The prosecutor further told the jury that, "The phone data of the phone sitting right next to this defendant when he is stopped and arrested in Independence, Missouri[,] shows that he traveled on the day of the shooting to Topeka, that he was exactly in the area at the time of the shooting."

In closing arguments, the prosecutor emphasized—again, without objection—that both law enforcement and Timley's own expert had demonstrated that "this defendant and

this defendant's phone, that phone found with him, had traveled, . . . was in Lawrence, was in Topeka, was in southeast part of town." The prosecutor then said:

> "If you remember, Jazmine Christopher told the police [Timley] took his son to his mom's house, or, I think [Timley] took his son to his mom's house. Address she gave is out by the lake in Southeast Topeka. So you see the phone travel along the turnpike or near the turnpike to southeast Topeka, consistent with going to that address to drop somebody off. It then travels north. It travels by the crime scene, and it just so happens that when Detective Broxterman runs the data, the handset that's reporting, that handset right there that's reporting information to the tower, is 2.63 miles from the tower. And as the crow flies and using the mapping program, the scene of this shooting is 2.63 miles exactly. . . .

> "Now, could it be 2.63 miles a little this way? Yes. A little this way? Yes. But that is such a coincidence that this defendant's phone is 2.63 miles from the tower and the scene of the shooting is 2.63 miles from the tower."

Timley's counsel responded by repeatedly pointing out the uncertain accuracy of the Sprint location data. In rebuttal, the prosecutor replied by emphasizing "[t]he only thing that Sprint will not guarantee the accuracy of, is the [PCMD], which is the exact distance from the handset to the tower." Additionally:

> "The only thing that Detective Broxterman found interesting is that the records that were provided from Sprint, that they won't tell you is a hundred percent, that at the time of the homicide, the time of the shooting, the tower received a call or information from that gentleman's cell phone, the handset was 2.63 miles away. [The address of the shooting] is 2.63 miles away from that tower. Could it be over here? Yes. Could it be over here? Yes. But that is what Detective Broxterman noted. Not for a hundred percent accuracy, because it is so abnormal to get that exact data reading and measurement from

a suspect phone. The fact that calls go in a particular direction, the time of the calls, when they bounce off the towers, that is a hundred percent accurate. So please don't be confused.

"Mr. Works says, oh, there's disclaimers and we can't tell. You certainly can. You certainly can."

The prosecutor also emphasized that Doty had essentially presented the same information, commenting that "I kind of liked his mapping a little bit better, 'cause it actually gave you on there the per call measurement, where his handset was."

"'[A]lthough the presence or absence of an objection may figure into our analysis of the alleged misconduct,'" a claim of prosecutorial error generally does not require a contemporaneous objection in order to be preserved for appellate review. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017) (quoting *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]). Kansas courts apply a two-step analytical framework to claims of prosecutorial error:

> "[T]he appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

This "wide latitude" extends to allegedly erroneous comments made in both opening statements and closing arguments. *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015). In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018).

"Opening statements are given to assist the jury in understanding what each side expects the evidence will prove and to frame the questions the jury will have to decide"; a prosecutor errs when straying outside the evidence they expect to be able to prove. *State v. De La Torre*, 300 Kan. 591, 609, 331 P.3d 815 (2014). Additionally, in crafting both opening statements and closing arguments, a prosecutor is permitted to discuss the evidence and draw "'reasonable inferences from that evidence.'" *Tahah*, 302 Kan. at 788 (quoting *State v. Crawford*, 300 Kan. 740, 749, 334 P.3d 311 [2014]).

Timley analogizes the prosecutor's statements to those at issue in *State v. Corey*, 304 Kan. 721, 374 P.3d 654 (2016). In *Corey*, this court found error—albeit ultimately harmless error—in a prosecutor's representation that DNA evidence recovered from a victim's body *was* that of the defendant, when, in actuality, "the estimated probability of randomly selecting an unrelated male from the general population with the same partial DNA profile was 1 in 9." 304 Kan. at 736. In the process, this court disagreed with the reasoning of the Court of Appeals, which had held—in reliance on *State v. Young*, No. 106,451, 2013 WL 1339873 (Kan. App. 2013) (unpublished opinion)—the prosecutor's comments to constitute a reasonable inference from the evidence. *Corey*, 304 Kan. at 736. And, more recently, this court concluded that a prosecutor misstated evidence by suggesting that a victim may have been strangled for as long as 12 minutes before the onset of death; the coroner's testimony, in contrast, was that death would occur after between 3 and 5 minutes. *State v. Thurber*, 308 Kan. 140, 163, 420 P.3d 389 (2018).

9

We have little trouble concluding that the prosecutor's remarks in closing statements did not exceed the wide latitude given to prosecutors in crafting their arguments. The prosecutor admitted that the PCMD location was not a hundred percent accurate and highlighted the "coincidence" that the phone was estimated to be 2.63 miles away from the cell tower—which was the same distance as the cell tower to the site of the shooting. To the extent that questions could be raised as to the accuracy of the PCMD, Timley's counsel and his expert witness effectively did so; while the prosecutor may have downplayed those concerns, we do not read his closing argument to improperly stretch the 2.63-mile figure derived from PCMD into a certitude.

One aspect of the prosecutor's *opening* statement gives us more pause, however: "[T]he defendant's phone is exactly at the location of the shooting at the time of the shooting." While a prosecutor is given wide latitude in drawing reasonable inferences from the evidence, two factors undermine the reasonableness of the inference drawn by the prosecutor here. First, as both Broxterman and Leal noted, the PCMD measurement is an estimate only; its accuracy was hotly contested throughout the trial, although even Timley's expert, Doty, admitted that the figure given was a "rational estimate." Second, even accepting that Timley's phone *was* 2.63 miles away from the tower, it could have been present at any point on an arc drawn 2.63 miles away from the tower; after all, as Broxterman testified, the *location* and *side* of the cell tower accessed by Timley's cell phone at 2:37 p.m. were not in dispute. Thus, had the prosecutor suggested unequivocally—and in the absence of any other qualifying language—that the PCMD could pinpoint the location of Timley's phone at the site of the shooting, the prosecutor would have committed error.

However, unlike the geometry student who merely provides an answer without showing their work, the prosecutor here did not make the challenged statement without context. Instead, the prosecutor's conclusion was premised on the following: (1) the data would show that Timley's phone was a certain distance away from the cell tower and

10

(2) the site of the shooting was equally distant from the cell tower. His conclusion that, (3) therefore, Timley's phone *was* at the site of the shooting, is undermined by the two factors identified above but not outside the realm of fair comment. In effect, the prosecutor's lead-up to the challenged statement laid out the factual premises upon which it rested, leaving the ultimate conclusion vulnerable to the jury's own reasoning. Further, we find it unnecessary to require the prosecutor to include the unspoken, but implicit, disclaimer inherent in all opening arguments, i.e., "If you look at the evidence, a reasonable inference is that . . ." As we have noted, the jury may draw reasonable inferences from the evidence, and jurors understand that prosecutors are advocates. By clearly establishing the evidentiary bases upon which their conclusion rested, the prosecutor avoided error—*barely*—in postulating that Timley's phone *was* "exactly" at the site of the shooting.

Regardless, even if we were to conclude that this sole statement strayed beyond the wide latitude given to prosecutors to draw fair inferences from the (expected) evidence, we have little trouble concluding, beyond a reasonable doubt, that it did not affect the outcome of the trial. Again and again, the potential inaccuracy of the PCMD evidence was noted for the jury. The prosecutor's closing arguments even conceded that the accuracy of the PCMD evidence was not certain. We cannot conclude that any reasonable jury would have ignored all other information calling the precision of the PCMD into question in favor of a single overstated conclusion set forth in an opening statement. Consequently, even if the prosecutor's remark had constituted prosecutorial error, we find no possibility that it contributed to the verdict.

*The admission of Broxterman's cell tower maps and accompanying testimony*

Timley next claims the district court erred in admitting the maps Detective Broxterman created from the Sprint data, along with his testimony about the relative location of Timley's phone over the course of the day of the shooting, because

11

Broxterman lacked the necessary expertise to support these conclusions. Timley objected to the admission of these materials on this basis, thus preserving the issue for appellate review.

"It is within the sound discretion of the trial court to determine whether or not an adequate foundation has been laid to introduce expert testimony as well as whether the expert witness is qualified to state an opinion." *State v. Jacques*, 2 Kan. App. 2d 277, 291, 579 P.2d 146, *aff'd as modified* 225 Kan. 38, 587 P.2d 861 (1978). Likewise, "[w]hether a witness, expert or layman, is qualified to testify as to his or her opinion is to be determined by the trial court in the exercise of its discretion." *State v. Sasser*, 305 Kan. 1231, 1243, 391 P.3d 698 (2017).

Two panels of the Kansas Court of Appeals have already considered—and rejected—arguments like Timley's in similar cases. *State v. Fleming*, No. 106,104, 2012 WL 4794560 (Kan. App. 2012) (unpublished opinion), and *State v. Smith-Parker*, No. 114,713, 2017 WL 5014898 (Kan. App. 2017) (unpublished opinion), *rev. denied* January 9, 2020. Timley acknowledges these cases but argues that this court should instead adopt the approach set forth in *State v. Patton*, 419 S.W.3d 125 (Mo. Ct. App. 2013).

In *Patton*, the Missouri Court of Appeals concluded that a lay witness could not, "without the aid of specialized experience or knowledge in the field of cellular communications," draw any inferences about "where the phone actually is" when it connects to a particular cell tower. 419 S.W.3d at 132. Critically, the cell towers accessed by Patton's phone near the site of the shootings—and at the *time* of the shootings—were "only about four miles as the crow flies across the river" from the house of Patton's cousin, where he claimed to have been sleeping. 419 S.W.3d at 132. Thus, Patton's professed location was "well within the hypothetical range of a cell site"; an expert would need to analyze "the many variables that influence cell site signal strength" before they

could further "narrow down the area in which Patton's phone must have been to have connected to a particular cell site." 419 S.W.3d at 132.

But the Missouri Supreme Court subsequently distinguished *Patton* in *State v. Blurton*, 484 S.W.3d 758 (Mo. 2016). There, the prosecution presented a lay witness who "mapped the location of . . . cell towers using a consumer mapping program" and "created a map that showed the times of the calls and their respective cell phone towers." 484 S.W.3d at 770. The Missouri Supreme Court opined that, so long as a lay witness confined their testimony to the general trajectory of the phone and did not attempt "to pinpoint the defendants' exact location within a small geographic area," expert testimony was not required because a lay "witness could still reasonably infer Mr. Blurton's general path of travel from Garnett to Cole Camp without using specialized skill or knowledge." 484 S.W.3d at 772.

Broxterman's testimony was much more akin to *Blurton* than to *Patton*. As in *Blurton*, Broxterman input the Sprint data—which was, itself, admitted without objection—into a program in order to more comprehensibly digest the information, i.e., to produce maps. Broxterman did not definitively represent that Timley *was* present at any given point at any given time—just that his phone connected to particular towers at particular times and from particular directions, as depicted on the maps generated from the Sprint data. According to Broxterman, Timley's phone had to have been somewhere in the *direction* of the cone emanating from each tower on the exhibits—if not necessarily the *area* of the cone—regardless of whether other towers were overburdened. Moreover, while the prosecutor asked Broxterman how he could "determine essentially that Mr. Timley's phone was at the scene of the homicide," Broxterman only responded by noting the side of the tower with which Timley's phone connected and the coincidence between the PCMD estimated distance of 2.63 miles and the tower's distance of 2.63

13

miles from the site of the shooting. Broxterman again repeated this point on cross-examination: "I'm not saying that Sprint tells me the handset's there [i.e., at the site of the shooting.]"

Accordingly, because Broxterman's exhibits and accompanying testimony did not require any specialized knowledge or expertise beyond that which he was demonstrated to possess, we find no error in the district court's decision.

*The district court's failure to sua sponte instruct the jury on a lesser included offense*

Timley next argues the district court committed clear error by failing to instruct the jury on intentional second-degree murder as a lesser included offense of premeditated first-degree murder. When presented with a claim that a district court has committed an error by failing to issue a jury instruction:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v.*] *Ward* [, 292 Kan. 541, 565, 256 P.3d 801 (2011)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

If a defendant does not object to a district court's jury instructions—as was the case here—the appellate court

> "appl[ies] the clear error standard mandated by K.S.A. 2017 Supp. 22-3414(3). Under that standard, an appellate court assesses whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' [The

14

defendant] has the burden to establish reversibility, and in examining whether he has met that burden we make a de novo determination based on the entire record. [Citations omitted.]" *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

We begin by noting that second-degree intentional murder is a lesser included offense of first-degree premeditated murder; thus, this instruction would have been legally appropriate. *State v. McLinn*, 307 Kan. 307, 324, 409 P.3d 1 (2018). The question of whether such an instruction would have been *factually* appropriate is murkier. Timley claims it was factually appropriate because a jury could infer Timley was just in the area of the shooting by chance while enroute to or from dropping his son off at his mother's and happened to see the victim, so he took the opportunity presented to shoot him. We hold that, when viewing the evidence in a light most favorable to Timley, a jury *could* have inferred that he committed a crime of opportunity, rather than with premeditation, by shooting Robbins as he drove by. Accordingly, we find the district court erred in failing to give this instruction sua sponte.

However, we are far from "firmly convinced" that the jury would have reached a different verdict but for this oversight. Even assuming the jury believed that Timley's primary purpose for traveling to Topeka was to drop off his son with his mother, Timley's mother was said to live "off of 45th" in Topeka, near Lake Shawnee, and Timley was known to be associated with an address in this area. Regardless of whether this address was that of Timley's mother, the area in which she was said to live was several miles away from the site of the shooting. Moreover, the site of the shooting was well out of Timley's way, if his sole purpose was to drop off his son before returning to Independence. Finally, an eyewitness described seeing the Magnum circle the block once before the shooting, suggesting, at the very least, that Timley remained in the area with purpose prior to the shooting. As we find it unlikely that the jury would ignore all of this in order to find that Timley acted without premeditation in shooting Robbins, we find no clear error in the district court's failure to instruct on intentional second-degree murder.

15

*The due process implications of the district court's failure to instruct the jury on lesser included offenses*

Timley next claims that the district court's failure to give any lesser included instructions violated his due process rights by removing a valid option from the jury.

We review such claims de novo. See, e.g., *In re Care & Treatment of Sigler*, 310 Kan. 688, 708, 448 P.3d 368 (2019). Should the court determine that there has been a violation of a defendant's due process right to a fair trial, "the error may be declared harmless where the State, as the party benefitting from the error, proves beyond a reasonable doubt that the error complained of did not affect substantial rights, meaning there is not a reasonable possibility that the error contributed to the verdict obtained." *State v. Ward*, 292 Kan. 541, 578, 256 P.3d 801 (2011).

Timley acknowledges his failure to raise this issue before the district court. Notwithstanding this failure, we recently considered the merits of a similar argument for the first time on appeal in *State v. Becker*, 311 Kan. 176, 186, 459 P.3d 173 (2020). We will again do so here.

In *Becker*—which also involved a conviction for premeditated first-degree murder—the district court rejected the defendant's requested lesser included offense instructions on second-degree murder and voluntary manslaughter. After examining *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), and *State v. Love*, 305 Kan. 716, 387 P.3d 820 (2017), we rejected Becker's newly raised due process argument. *Becker*, 311 Kan. at 186-87.

While Timley acknowledges *Becker*, he claims it wrongfully applied *Beck*. In support of this argument, Timley directs us to *Vujosevic v. Rafferty*, 844 F.2d 1023, 1027 (3d Cir. 1988). But we find *Vujosevic* unpersuasive for two reasons. First, the Third

16

Circuit's decision to extend *Beck* to noncapital cases appears to be the minority position among the federal appellate courts. See, e.g., *Solis v. Garcia*, 219 F.3d 922, 928 (9th Cir. 2000) (describing only the Third and Sixth Circuits as having "extended the *Beck* rule generally to non-capital cases," in contrast to the Fifth, Tenth, and Eleventh Circuits); see also *McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014) (finding habeas relief unavailable "[b]ecause the Supreme Court has never held that due process requires lesser-included-offense instructions in a non-capital case"). Second, *Vujosevic* involved the denial of an actual request for a lesser included offense instruction. *Vujosevic*, 844 F.2d at 1027. The Third Circuit particularly emphasized in *Vujosevic* that, under *its* application of *Beck*, "a court must give a *requested* instruction on lesser included offenses where it is supported by the evidence" in noncapital cases as well as capital cases. (Emphasis added.) 844 F.2d at 1027. As no such instruction was requested here, *Vujosevic* is distinguishable from the case at bar.

Based on our prior decisions in *Becker* and *Love*, we find no due process violation in the district court's failure to issue a lesser included offense instruction sua sponte.

*Cumulative error*

Finally, Timley asserts that his conviction should be reversed on the basis of cumulative error. Because we have only found one instance of harmless error—the district court's failure to sua sponte provide a lesser included offense instruction—we necessarily reject Timley's claim of cumulative error. See *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014) ("Nor may a single error constitute cumulative error."). And even if we had found harmless error in the prosecutor's opening statement, we are satisfied that such an error bore no relation to the district court's instructional error. The prosecutor's statement, had we found it to constitute prosecutorial error, could have affected the jury's determination of the *identity* of the shooter, not the *spontaneity* of the

17

shooting itself. See *State v. Holt*, 300 Kan. 985, 1008, 336 P.3d 312 (2014) ("[I]t is significant that the three errors had no relationship with one another.").

CONCLUSION

Timley's conviction for premeditated first-degree murder is affirmed.

MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

BILES, J., concurring:  I concur in the result. I agree with the majority in all aspects except its conclusion that the prosecutor's opening statement was fair comment. Slip op. at 11 ("By clearly establishing the evidentiary bases upon which their conclusion rested, the prosecutor avoided error—*barely*—in postulating that Timley's phone *was* 'exactly' at the site of the shooting."). I would hold this statement to be prosecutorial error.

Recall its context. During his opening, the prosecutor said:

"[W]here the defendant's phone has been, is not only coming to Topeka that same afternoon, but exactly 2.46 miles [*sic*] from the shooting location. And we know that because his phone pings off a tower. That tower is 2.46 miles [*sic*] from [the address of the shooting]. *So the defendant's phone is exactly at the location of the shooting at the time of the shooting.*" (Emphasis added.)

---

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,414 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

This is not an instance in which an attorney's opening statement simply failed to accurately forecast the expected evidence. The prosecutor had to know what his own technical witnesses would say on the stand and had to recognize the limitations of the cell tower location estimates they were providing. Yet this prosecutor said the technical evidence would show defendant's phone was "*exactly* at the location of the shooting at the time of the shooting." (Emphasis added.) This is not a mere slip-of-the-tongue.

Words have meaning. And the word "exactly" communicates precision—not an approximation. Webster's New World College Dictionary 505 (5th ed. 2014) (defining "exactly" as "in an exact manner; accurately; correctly; precisely"). This court has previously concluded that a prosecutor misstated evidence in declaring a strangulation could have lasted as long as 12 minutes before the onset of death when the only evidence was a coroner's estimate of "'three to five minutes.'" *State v. Thurber*, 308 Kan. 140, 163, 420 P.3d 389 (2018). And this court also found error in a prosecutor's reference to the defendant's DNA being on a victim's stomach, when "[t]he estimated probability of randomly selecting an unrelated male from the general population with the same partial DNA profile was 1 in 9." *State v. Corey*, 304 Kan. 721, 736, 374 P.3d 654 (2016). There is no difference here.

Going into trial, the prosecutor would have had to appreciate the Sprint PCMD evidence did not show Timley's *exact* location at the time of the shooting, and that Sprint provided no guarantee for the PCMD evidence's accuracy. The prosecutor also would have had to understand going into that trial the Sprint data only showed the phone could have been at *any* point 2.63 miles away from the cell tower in the direction of the "cone" set forth in State's Exhibit 97. And the "ballpark" nature of the data becomes clearer when one mentally extends the size of the "cone" to the asserted radius from the tower of 2.63 miles because the "cone" would take up nearly the entire map depicted in the exhibit. Put

19

simply, Timley's phone could have been anywhere on the perimeter of this extended cone. This is the opposite of an "exact" location.

The majority seemingly forgives what the prosecutor said by comparing him favorably to "the geometry student who merely provides an answer without showing their work." Slip op. at 10. But given that the "context" provided for this statement was so obviously and admittedly imprecise, the fact the prosecutor spoke about it with certitude only makes it apparent to me the prosecutor was characterizing the technical data as something it was not.

I would hold it was error for the prosecutor in opening statement to tell the jury this cell tower data would reflect the defendant's exact location. That said, the error is harmless for the reasons stated in the majority opinion. Slip op. at p. 11.

ROSEN, J., and WARD, S.J., join the foregoing concurring opinion.