NOT DESIGNATED FOR PUBLICATION

No. 127,982

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JUAN MARTIN AGUILERA,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Submitted without oral argument. Opinion filed April 24, 2026. Conviction affirmed, sentence vacated, and case remanded with directions.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., ARNOLD-BURGER and SCHROEDER, JJ.

PER CURIAM: Juan Martin Aguilera appeals his conviction for aggravated indecent liberties with a child, an off-grid felony. He argues that the prosecutor erred by vouching for the victim's credibility during closing arguments and that the district court erred in sentencing him after departing to a grid-based sentence. After careful review, we affirm his conviction but vacate his sentence and remand the case for resentencing.

1

FACTUAL AND PROCEDURAL BACKGROUND

On August 12, 2023, J.T., who was 13 years old at the time, was home alone when her brother-in-law, Aguilera, came over. Aguilera lived next door with J.T.'s older sister (his wife). He had come to the house to use a medical cream to treat an injury on his leg. J.T. let Aguilera in the house and he went to her parents' bedroom to apply the cream while J.T. stayed in the living room. From this point, J.T.'s and Aguilera's accounts differ.

According to J.T.'s trial testimony, Aguilera had been in the bedroom for a while, so she went to check on him. She found him still looking for the cream. Aguilera started to leave the bedroom but then grabbed J.T. by the waist, picked her up, and threw her on the bed. Aguilera then tried to kiss her, but she turned her face away. Still, Aguilera bit her breast and nipple over her clothes and then lifted her shirt and bit her stomach, leaving marks. Aguilera told her during this encounter that she had big breasts for her age. J.T. was wearing a jacket, shirt, bra, and shorts.

J.T. then tried to push Aguilera off, but he told her she was too weak. J.T. told him to get off her, and he replied that he was not going to do anything to her because she was still a minor. Aguilera then got off J.T. As he was doing so, she punched him in the arm, and he threw her back on the bed before leaving the house.

Aguilera's account of the incident to law enforcement differed. During his interview with law enforcement, which was played for the jury, he told officers that he went into the bedroom to get the medical cream. While he was doing so, J.T. entered the bedroom and tried to stick some athletic tape that he was using on his face, apparently to be playful. She had recently been playful with him by pretending like she was going to punch him. So when she tried to stick the tape on his face, he tried to push her away toward the bed, but she grabbed a hold of him so they both rolled onto the bed.

2

Aguilera told officers that he then got off the bed, but J.T. again acted like she would throw a punch at him, so he grabbed her by the stomach and threw her toward the bed again before leaving the house. He denied touching her breast or trying to kiss her.

The State charged Aguilera with one count of aggravated indecent liberties with a child, an off-grid person felony, under K.S.A. 21-5506(b)(3)(A) and (c)(3). The jury found Aguilera guilty of aggravated indecent liberties with a child.

Before sentencing, Aguilera moved for a departure to a grid-based sentence. At sentencing, Aguilera's presentence investigation report listed his criminal history score as I, and neither party objected to that finding. The district court granted his motion, departing from the presumptive off-grid hard 25 sentence to a grid-based sentence. The district court sentenced Aguilera to 165 months' imprisonment. The district court judge explained that he departed to a grid-based sentence because the degree and nature of the touching was less than "typical" for a conviction for aggravated indecent liberties with a child. The district court also sentenced Aguilera to lifetime parole with electronic monitoring.

Aguilera timely appeals.

ANALYSIS

Aguilera raises three arguments. First, he argues that the prosecutor erred during closing argument by improperly vouching for J.T.'s credibility. Second, he argues his sentence is illegal because the district court sentenced him in the 1-I grid box instead of the 3-I grid box. Third, Aguilera argues the district court erred by ordering him to serve lifetime parole with electronic monitoring instead of postrelease supervision. We address each issue in turn.

3

I.      DID THE STATE COMMIT PROSECUTORIAL ERROR IN ITS CLOSING ARGUMENT?

Aguilera first argues that the prosecutor erred during closing argument by improperly commenting on J.T.'s credibility, which deprived him of a fair trial. He asks us to reverse his conviction and remand for a new trial. The State responds that when the challenged comments are viewed in context, they are not improper.

*Preservation*

Aguilera did not object to these comments during the State's closing argument. Even so, we will review a prosecutorial error claim based on a prosecutor's comments made during closing argument even without a timely objection, but we may figure the presence or absence of an objection into our analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

*Standard of Review*

In considering a claim of prosecutorial error during closing argument we apply a two-step standard of review.

> "First, considering a prosecutor's statements in context, appellate courts ask whether the prosecutor stepped outside the wide latitude afforded prosecutors 'to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.' *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022); *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021). This wide latitude extends to allow prosecutors to highlight evidence and discuss inferences reasonably drawn from that evidence. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020). But a prosecutor may not misstate the law applicable to the evidence, comment on witness credibility, or shift the burden of proof to the defendant. *State v. Hilt*, 307 Kan. 112, 124, 406 P.3d 905 (2017); see *State v. Sherman*, 305 Kan. 88, Syl. ¶ 5, 108-09, 378 P.3d 1060 (2016).

"If an error is found, appellate courts move to the second step of review to determine whether to reverse the defendant's convictions because of the prosecutor's error. In that review, appellate courts apply the traditional constitutional harmlessness test stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See *Sherman*, 305 Kan. at 109. Under that test, 'prosecutorial error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict."' 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011])." *State v. Coleman*, 318 Kan. 296, 302-03, 543 P.3d 61 (2024).

*The Applicable Law*

Aguilera argues that the prosecutor improperly bolstered J.T.'s credibility in closing argument. As discussed, "a prosecutor committed error if the act complained of fell outside the wide latitude afforded the prosecutor in conducting the State's case in a way that does not offend the defendant's constitutional right to a fair trial." *Bodine*, 313 Kan. at 406. "Prosecutors have wide latitude in crafting their arguments and drawing reasonable inferences from the evidence." 313 Kan. at 406. Still, the prosecutor's argument "'must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."'" 313 Kan. at 406. And "[i]t is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, including the defendant." *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016); *State v. Alfaro-Valleda*, 314 Kan. 526, 538, 502 P.3d 66 (2022) ("[A] prosecutor's wide latitude does not extend to announcing the prosecutor's opinion on issues for the jury, including the defendant's guilt or innocence or witness credibility."). Offering a personal opinion on the credibility of a witness or other piece of evidence is referred to as "vouching." *State v. Pabst*, 268 Kan. 501, 511, 996 P.2d 321 (2000).

5

Yet, "[i]n closing argument, the prosecutor may draw reasonable inferences from the evidence." *State v. Hall*, 292 Kan. 841, Syl. ¶ 3, 257 P.3d 272 (2011); see *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017) (holding prosecutors enjoy wide latitude in crafting closing arguments, but prosecutor's arguments must remain consistent with the evidence). Further, "[a] prosecutor may argue that facts do not support defense theories." *State v. Willis*, 319 Kan. 663, Syl. ¶ 2, 557 P.3d 424 (2024).

So although the State may not vouch for the honesty of a witness, a prosecutor "may comment on a witness' lack of motivation to be untruthful." *State v. Hachmeister*, 311 Kan. 504, 519-20, 464 P.3d 947 (2020). When doing so, the prosecutor must "base these comments on the evidence and reasonable inferences from the evidence without stating their own personal opinion concerning the witness' credibility." 311 Kan. at 519. Prosecutors can "legitimately discuss the circumstances tending to demonstrate a witness' reliability or lack thereof." *State v. Spilman*, 63 Kan. App. 2d 550, 569, 534 P.3d 583 (citing *Pribble*, 304 Kan. at 835). A jury may consider "the demeanor of a witness, as well as his or her words. And a prosecutor may remind jurors about a witness' demeanor when the prosecutor is making a closing argument." *State v. Todd*, 299 Kan. 263, 285-86, 323 P.3d 829 (2014).

Rhetorical questions asking the jury to consider whether a witness has any motive to be untruthful are also permitted:

> "One legitimate factor for the jury to consider in assessing witness credibility is a witness' motive to be dishonest. Thus, we have approved of a prosecutor's use of rhetorical questions to encourage the jury to consider whether a witness has any motive to be untruthful. Likewise, '[p]rosecutors may comment on a witness' lack of motivation to be untruthful but must base these comments on the evidence and reasonable inferences from the evidence without stating their own personal opinion concerning the witness' credibility.' [Citations omitted.]" *State v. Jordan*, 317 Kan. 628, 649, 537 P.3d 443 (2023).

"A prosecutor who speculates about witness motives walks a fine line between 'explaining to juries what they should look for in assessing witness credibility,' and 'improperly bolstering the credibility of its witnesses' by 'injecting [his or] her personal opinion regarding witnesses' motives.' [Citations omitted.]" *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018). When a prosecutor ties his or her comments on assessing credibility to the evidence and to "legitimate factors bearing on witness credibility," the comments fall "within the wide latitude afforded prosecutors in closing argument, even if by only the slightest margin." *Jordan*, 317 Kan. at 650-51.

### *The Prosecutor's Comments*

We set out the prosecutor's argument at length, with the challenged language in italics, to fulfill our duty to view the challenged comments in context, rather than in isolation. See *Bodine*, 313 Kan. at 406-07 ("'In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation.' [Citation omitted.]").

During his closing argument, the prosecutor stated:

"So the evidence that I would ask you to consider in deciding this case is, one, Exhibits 3, 11, 12, 13, and 14. What are those? Those are the photographs—or at least some of the photographs the State admitted. They demonstrate the injury that [J.T.] suffered. They are consistent with what she says happened. They're inconsistent from what [Aguilera] says happened. Here they are. So, again, it's not huge. And it's important to point out. If you saw the elements, the State doesn't need to prove predispositive injury here. The State doesn't need to prove any injury, in fact. But there was an injury. There's injury right up here—well, perhaps from fingernails or something scratched. And you can determine that.

7

"But then the bite mark. And you can see it more clearly in State's Exhibit 11, which was taken by the forensic nurse, Terri Griffin. You see the top row of teeth and the bottom row of teeth where he bit down. State's Exhibit 12, a little closer in. 13, the measurement. And you heard from Nurse Griffin, who's worked as a forensic nurse for 12 years working with sex crimes, working with domestic violence, and who has seen bite marks before, and says, that's a bite mark. There it is. And then the broken nail as well.

"And that's—that's it in terms of physical evidence in this case. But there's more evidence. There's Laura's [J.T.'s sister] testimony too. What did she tell you? That [J.T.] was upset. It wasn't like she was, like, laughing around, joking about this. She was upset. She was confused about what was going on, about what had happened to her. And she immediately called for help. She didn't sit around, concoct, you know, concoct a story. She immediately called dad, dad called Laura, and Laura's over there. Everybody gets over there to help out.

"*And you get to decide, you know, weigh [J.T.'s] demeanor on the stand, how she testified, how she looked. You know, at the time was she nervous on the stand? Perhaps. Did she not really want to be here talking about this? Perhaps. But did she do it? And when she was up there, did she tell you what had happened?*

"You can also consider [Aguilera's] interview. That's State's Exhibit 15. Yeah. [Aguilera] denied this crime, sure, but he admitted to being there. That corroborates [J.T.]. He admitted to grabbing her, corroborates her. He admitted to throwing her on the bed. Again, that corroborates her. He denied touching her breast. But it's really important there, nobody asked about that. Nobody asked him.

"And, in fact, before they even got to that, Detective Van Daley, as you heard and was interpreted by Officer Solorzano, asked him, has anyone told you what [J.T.] is claiming happened. And he said no. So why does he jump to, I didn't touch her breast. And then even more importantly, why doesn't he then say, also, I didn't stick my hands down her pants, I didn't touch her vagina, I didn't, you know, expose myself, anything like that. Could it be because he knows what happened, and he knows what he needs to deny? He knows what [J.T.] is going to accuse him of because it happened? Consider that. It's always what's said, but also what's not said.

"So what about the DNA. Right? I'm sure that's kind of banging around in your head. We just, you know, talked about swabs that were collected. You know, and you don't see any results. The question would be, which element requires DNA evidence?

8

You know, 50 years ago were there not sex crimes? There's no DNA evidence. Could people not be convicted? Which element requires DNA evidence? Go back through. There aren't any. The only question is are you convinced beyond a reasonable doubt that this happened.

"And besides, what does DNA prove anyways? DNA proves a person was present and a touching occurred. That's what you heard, you know, when Nurse Griffin was talking about it. What's it going to show? That, you know, some trace of DNA was left behind. Well, [J.T.] said [Aguilera] was there and a touching occurred. [Aguilera] says he was there and a touching occurred. What's the DNA going to prove that they haven't already testified to? Or that hasn't been agreed to?

"He admits touching her, to grabbing her around the waist, everywhere where the DNA would show. He admits to tossing her on the bed. DNA does not prove why a touching occurred. It doesn't prove how a touching occurred. All it proves, again, is that a person was present and a touching occurred. Well, that's been established. So what's the DNA's purpose for? Other than a red herring.

"*So, really, what this comes down to then is this accusation that [J.T.] is lying. Right? She says this happened. So what if she's lying? My question to you is why. What does she have to gain from this? And why keep the lie so limited? If she concocted this whole thing, why doesn't he try to rape her? In fact, it's clear he didn't, that he stopped, and said, because you're 13, I'm not going to do anything. Well, he had already done something. But why not say, he tried to rape me? Why not say he stuck his hand down my pants? Why not say he threatened her? If you tell anyone about this, I'll kill you, something like that. You know?*

"*Why say that he only touched her breasts over the clothes? Why not say he exposed himself? Why keep it so limited? Maybe because that's what happened. That's it. But that's enough.*

"And think about it too, what did reporting this get her? Do people lie without motive, without a reason? You know, she had to talk about trying sexual experiences with strangers. Good times. You know, she got to talk to a nurse, police officer, prosecutors, a judge at the preliminary hearing, a jury of 12 strangers, 13 actually. She got to have an embarrassing medical examination, go to the hospital for hours. Whoopee.

"This caused problems in her sister's marriage, you heard her say. I mean, she gets along with Petra [J.T.'s sister and Aguilera's wife] still. Right? Petra is affected by this. That's her sister. So why report this? Why lie about this? And also consider, she was

9

determined to see this through. You know, she told Officer Solorzano about what happened, and even was—when she talked to him, was like, you know, and he tried to bite me. I haven't even looked yet to see what injuries I have. And, you know, they looked and, well, yeah, bite mark.

"She told Nurse Griffin. She came to the preliminary hearing. She came here to trial and told you. She was determined to see this through. Why? Why if you didn't have—why not at some point just be like, you know what, I don't remember, or I don't want to talk about this anymore. She didn't do that.

"Look, again, Solorzano, she tells him that [Aguilera] attacked her, and [Aguilera] bit her, and the defendant touched her. Nurse Griffin, [Aguilera] attacked her, provided the same details, goes through an embarrassing exam where she's photographed. You heard Nurse Griffin say she examined her breast and everything too. What fun. At the preliminary hearing, testified about that and had to be cross-examined. In trial, again, here [Aguilera] attacked her, described the same details. Again, submitted herself to cross-examination.

"THE COURT: Ten minutes used—or ten minutes left.

"[THE STATE]: Thank you, Judge.

"Why do all of this if she's just making it all up? Why?

"*Ladies and gentlemen, I submit to you that you're not going to be able to come up with an answer why she would have lied, why she would have made it so limited, other than that's what happened.* And if you can find that, find that's what happened, then I'd ask you to find [Aguilera] guilty. Thank you."

*The prosecutor's comments during closing argument were not improper.*

Having reviewed the prosecutor's comments in context, we find they fall within the bounds of the wide latitude given prosecutors in closing argument. Throughout closing arguments, the prosecutor told the jurors that it was their job to assess credibility and pointed out items for the jury to consider in making that determination. The prosecutor never told the jurors that there was no reason to doubt J.T.'s account of what happened. Instead, he told the jurors it was their job to determine whether they found her credible. And through rhetorical questions, he pointed the jury to J.T.'s lack of motivation

10

to be untruthful and to evidence to help them make that determination. This use of rhetorical questions is permitted. See *Jordan*, 317 Kan. at 648-50. The prosecutor tied the victim's testimony to the evidence and to legitimate factors bearing on witness credibility. Rather than vouching for J.T.'s credibility, he used rhetorical questions to encourage the jury to consider whether J.T. had any motive to be untruthful. See 317 Kan. at 649. The challenged comments were not erroneous, so we find no prosecutorial error.

## II.     DID THE DISTRICT COURT USE THE INCORRECT SENTENCING GRID BOX TO DETERMINE AGUILERA'S DEPARTURE SENTENCE?

Next, Aguilera argues his sentence is illegal because the district court sentenced him in the 1-I grid box instead of the 3-I grid box. The State concedes that the district court used the incorrect grid box when sentencing Aguilera, and we agree.

*Preservation*

Although Aguilera did not challenge the length of his sentence before the district court, an illegal sentence may be raised at any time while the defendant is serving the sentence, including the first time on appeal. K.S.A. 22-3504(a); *State v. Steinert*, 317 Kan. 342, 351-52, 529 P.3d 778 (2023). Accordingly, we may consider Aguilera's challenge to the legality of his sentence.

*Standard of Review*

Whether a sentence is illegal is a question of law over which appellate courts exercise unlimited review. See *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024). To the extent resolution of this issue requires us to interpret a statute, we have unlimited review. *Steinert*, 317 Kan. at 349.

11

*The district court used the incorrect grid box when sentencing Aguilera.*

An illegal sentence is a sentence: (1) imposed by a court without jurisdiction; (2) that does not conform to the applicable statutory provision, either in character or the term of punishment; or (3) that is ambiguous about the time and manner in which it is to be served. K.S.A. 22-3504(c)(1); see *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022). Aguilera argues that his sentence is illegal because it does not conform to the applicable statutory provision, K.S.A. 21-6627(d)(1).

Jessica's Law requires a defendant, who is 18 years or older, be sentenced to "to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years," which is known as a "hard 25" sentence, for certain enumerated sex crimes, including aggravated indecent liberties with a child. K.S.A. 21-6627(a)(1). Aguilera's conviction for aggravated indecent liberties under K.S.A. 21-5506(b)(3) is subject to sentencing under Jessica's Law because at the time of the crime Aguilera was over the age of 18 and the victim was under the age of 14. See K.S.A. 21-5506(c)(3).

Although a hard 25 sentence is the statutorily presumed disposition, K.S.A. 21-6627(d)(1) allows a district court to depart from an off-grid sentence to a grid-based sentence when the crime of conviction is the offender's first off-grid sex offense if "the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." The district court did so here; it made findings on the record of substantial and compelling reasons to depart to a grid-based sentence and then did so.

K.S.A. 21-6627(d)(1) states that a departure sentence "shall be the sentence pursuant to the revised Kansas sentencing guidelines act." The Kansas Supreme Court has interpreted this language to mean a sentence imposed using the nondrug sentencing guidelines grid. *State v. Spencer*, 291 Kan. 796, Syl. ¶ 7, 248 P.3d 256 (2011). And on

12

that nondrug sentencing grid, "[t]he offense severity level used to determine the grid box into which a defendant falls is that assigned to the crime of conviction when it lacks the element of disparity between the defendant's and the victim's ages." *State v. Floyd*, 291 Kan. 859, 861, 249 P.3d 431 (2011). See *Spencer*, 291 Kan. at 830.

This statute refers us back to the aggravated indecent liberties with a child statute to determine the prescribed severity levels. Aguilera was convicted under K.S.A. 21-5506(b)(3), which is "a severity level 3, person felony, except as provided in subsection (c)(3)." As we mentioned above, subsection (c)(3) moved Aguilera from a grid-based sentence to a sentence under Jessica's Law because he was 18 years of age or older and the victim was under the age of 14. When (c)(3)'s element of age disparity is removed, per *Floyd*, K.S.A. 21-5506(c)(2)(C) applies and defines Aguilera's crime of conviction as a severity level 3, person felony.

The district court sentenced Aguilera to 165 months' imprisonment, which is the high sentence for a severity level 1 conviction with an I criminal history. See K.S.A. 21-6804(a). In other words, the district court sentenced Aguilera to a sentence in the severity level 1 grid box when his crime was in the severity level 3 grid box. This was error. See *Floyd*, 291 Kan. at 861. The 3-I grid box's high, mid, and low numbers are 61 months, 59 months, and 55 months, respectively. See K.S.A. 21-6804(a). Because Aguilera's sentence to 165 months does not conform to the applicable sentencing statutes, it is illegal. Accordingly, we vacate his prison sentence and remand for resentencing.

III.    DID THE DISTRICT COURT ERR BY ORDERING AGUILERA TO SERVE LIFETIME PAROLE WITH ELECTRONIC MONITORING?

Finally, Aguilera argues the district court erred by ordering him to serve lifetime parole with electronic monitoring instead of postrelease supervision. The State concedes this error, and we agree. To avoid the same error on remand, we explain why.

13

*Preservation*

Aguilera did not challenge the imposition of lifetime parole with electronic monitoring below. But a defendant's postrelease supervision term and conditions are part of his or her sentence. See *State v. Anthony*, 273 Kan. 726, 728, 45 P.3d 852 (2002); see also K.S.A. 22-3717(d)(1); K.S.A. 22-3722. And as discussed above, a challenge to an illegal sentence may be raised at any time while the defendant is serving the sentence, including the first time on appeal. K.S.A. 22-3504(a); *Steinert*, 317 Kan. at 351-52. Accordingly, we may consider this challenge to the legality of Aguilera's sentence.

> *The district court incorrectly ordered Aguilera to serve lifetime parole with electronic monitoring instead of postrelease supervision.*

Aguilera argues that his sentence is illegal because it does not conform, either in character or punishment, to the applicable statutory provision, K.S.A. 22-3717, which governs both parole and postrelease supervision.

Parole and postrelease supervision are not the same thing. "Parole is a conditional release from physical custody" before the expiration of the defendant's full term of imprisonment. *Parker v. State*, 247 Kan. 214, 217, 795 P.2d 68 (1990); see K.S.A. 22-3717(g). The many rules surrounding parole, including which crimes are eligible, are set forth in K.S.A. 22-3717. Parole is "'a term of art that is limited to off-grid crimes, i.e., usually those receiving indeterminate sentences.'" *State v. Cash*, 293 Kan. 326, 330, 263 P.3d 786 (2011) (quoting *State v. Ballard*, 289 Kan. 1000, 1014, 218 P.3d 432 [2009]).

"Postrelease supervision," also governed by K.S.A. 22-3717, is defined by K.S.A. 21-6803(p) as:

"the release of a prisoner to the community after having served a period of imprisonment or equivalent time served in a facility where credit for time served is awarded as set forth by the court, subject to conditions imposed by the prisoner review board and to the secretary of correction's supervision."

Postrelease supervision "'has traditionally been applied to only grid crimes.'" *Cash*, 293 Kan. at 330 (quoting *Ballard*, 289 Kan. at 1014).

So, "parole" and "postrelease supervision" are not interchangeable. See *State v. Ross*, 295 Kan. 1126, 1132, 289 P.3d 76 (2012). "On-grid sentences consist of a prison term followed by a mandatory period of postrelease supervision," whereas "[o]ff-grid crimes consist of a mandatory term of imprisonment followed by parole eligibility." 295 Kan. at 1132 (citing to K.S.A. 22-3717[b] and [d][1]).

Additionally, when a defendant's off-grid crime is one designated by K.S.A. 21-6604(r), the district court must order the defendant be electronically monitored upon release from imprisonment for the rest of his or her life. See K.S.A. 21-6627(a)(1)(C) (designating aggravated indecent liberties with a child as a crime subject to a hard 25 sentence).

Although Aguilera was convicted of an off-grid crime, the district court departed to the sentencing grid and imposed a determinate sentence. So the statutory provisions that apply to persons serving indeterminate sentences—parole and lifetime electronic monitoring—do not apply to Aguilera. See *Ballard*, 289 Kan. at 1014. Thus, Aguilera is subject to lifetime postrelease supervision, not parole or lifetime electronic monitoring. K.S.A. 22-3717(d)(1)(G) (requiring "persons sentenced to imprisonment for a sexually violent crime committed on or after July 1, 2006, when the offender was 18 years of age or older, and who are released from prison, shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life"). Thus, we vacate the

15

district court's order of lifetime parole and electronic monitoring. We affirm Aguilera's conviction but vacate his sentence and remand for resentencing in accordance with this opinion.

Conviction affirmed, sentence vacated, and case remanded with directions.